IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim. No. 4:24-CR-140 |
| | ) | |
| v. | ) | GOVERNMENT'S |
| | ) | SENTENCING |
| SHAWNNA MARIE CUNNINGHAM, | ) | MEMORANDUM |
| | ) | |
| Defendant. | ) | |

## Table of Contents

INTRODUCTION ......................................................................................................... 1

FACTUAL OBJECTIONS & ADVISORY GUIDELINES RANGE ............................. 2

THE § 3553(a) FACTORS SUPPORT A 292-MONTH SENTENCE ......................... 12

CONCLUSION........................................................................................................... 15

## INTRODUCTION

On September 16, 2024, Defendant, a methamphetamine user herself prohibited from possessing guns, provided convicted felon Joshua Green with a firearm and the incentive to use it to shoot two Des Moines Police Officers. Defendant's bad behavior wasn't limited to that day, however, as she had consistently provided Green with that firearm for years. Even after he was caught with it and sent to prison for possessing it as a felon, Defendant got it back from the police department and gave it back to Green when he was released from prison. Defendant's conduct deliberately circumvented the firearms laws in this country which are

designed to prevent precisely this situation.  The Court should impose a sentence of 292 months' imprisonment.

## FACTUAL OBJECTIONS & ADVISORY GUIDELINES RANGE

The government agrees with the guideline range contained in the PSR, which are as follows:

| | |
|---|---|
| Attempted murder (§§2K2.1(c)(1), 2A2.1(a)(1)) | 33 |
| Victim injuries (§2A2.1(b)(1)(A)) | +4 |
| Official victim (§3A1.2(c)(1)) | +6 |
| Acceptance of responsibility | -3 |
| Total offense level | 40 |
| | |
| Criminal history: | I |
| | |
| Guideline range: | 292 to 365 months' imprisonment, which becomes 292 to 360 months' imprisonment due to statutory maximum |

While Defendant has several factual objections to the offense conduct section of the PSR, they relate to information Defendant would like added to the noted paragraphs versus objecting that the information currently contained is incorrect.  If Defendant would like factual information added to the offense conduct section of the PSR, the government suggests she provide the Court with evidence supporting those facts.  Once she has done so, the Court can determine whether the information is factually supported, by a preponderance of the evidence, warranting changes to the PSR.  Absent that, the Court should accept the offense conduct section as factually accurate as written.

Other than that potential issue, the only issue for the Court to resolve at sentencing is a legal one—whether the guideline calculation should reflect a cross

reference to attempted first degree murder based on her co-conspirator's shooting at several Des Moines Police Officers. For the reasons outlined below, it should.[1]

18 U.S.C. § 922(g) guideline calculations start at §2K2.1. However, the guidelines provide that "[i]f the defendant[2] used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense . . . apply §2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above." USSG §2K2.1(c)(1)(A). Moving to §2X1.1, "[w]hen an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section." USSG §2X1.1(c)(1). Attempted murder is expressly covered by §2A2.1. *See* USSG §2X1.1, comment. (n.1). In that guideline,

---

[1] In addition to the unobjected to information in the PSR, the government also relies on contemporaneously submitted government exhibits, which are as follows:
- Government Exhibit 1—DMPD Officer J.B.'s Body Camera;
- Government Exhibit 2—DMPD Officer J.B.'s Dash Camera;
- Government Exhibit 3—DMPD Officer C.M.'s Body Camera;
- Government Exhibit 4—DMPD Officer Hodges's Body Camera;
- Government Exhibit 5—DMPD Officer Contreras's Body Camera;
- Government Exhibit 6—DMPD Officer Contreras's Dash Camera;
- Government Exhibit 7—DMPD Det. Ben Carter's Supplemental Report.

These exhibits are also submitted for 18 U.S.C. § 3553(a) and/or departure purposes.

[2] In her objections, Defendant seems to argue the term "the defendant" is restricted to the definition contained in application note 13 of §2K2.1 and, specifically, an aiding and abetting theory of liability regarding her responsibility for Joshua Green's conduct. However, as Application Note 13 and Eighth Circuit case law make clear, the definition of "defendant" included in Application Note 13 is limited to application of USSG §2K2.1(b)(5). *United States v. Vega*, 720 F.3d 1002, 1004-05 (8th Cir. 2013). As *Vega* explains, the standard for the remainder of the application of §2K2.1 is the usual reasonable foreseeability definition contained in USSG §1B1.3(a)(1)(B). Although, here, Defendant's conduct meets either standard.

the base offense level is determined by the degree of murder—first degree having a 33, and 27 otherwise.  USSG §2A2.2(a).

The federal definition of first degree murder requires, for purposes of this case, malice aforethought and premeditation.  In the Eighth Circuit, these concepts are not synonymous.  *Beardslee v. United States*, 387 F.2d 280, 288-89 (8th Cir. 1967); *see also* Eighth Circuit Model Instructions 6.18.1111A, 6.18.1111A-1, 6.18.111A-2.  Malice aforethought requires the intent, at the time of the killing (or attempted killing), to willfully "take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences to human life."  Eighth Circuit Model Instruction 6.18.1111A-1.  It does not require any ill will, spite, or hatred towards the individual killed.  *Id.*  Instead, it may be demonstrated "by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that [the factfinder] is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm."  *United States v. Cottier*, 908 F.3d 1141, 1146 (8th Cir. 2018) (internal quotations and citations omitted).  Intent to kill can be demonstrated by inference, in that an individual intends the natural and probable consequences of their actions.  *United States v. Comly*, 998 F.3d 340, 343 (8th Cir. 2021).  Shooting bullets at an individual, while in close range to that individual, is malice aforethought and demonstrates intent.  *See, e.g.*, *id.* (finding malice aforethought where the defendant shot at officer at close range); *United States v. Greer*, 57 F.4th 626, 629 (8th Cir. 2023) ("[S]hooting at a particular person, or a group of people, demonstrates a specific intent to kill."); *United*

*States v. Angel*, 93 F.4th 1075, 1078-79 (8th Cir. 2024) (finding intent to kill where the defendant fired five shots at the victims, hitting one); *United States v. Williams*, 41 F.4th 979, 985-86 (8th Cir. 2022) (finding malice aforethought where defendant shot at the victim nine times at close range); *United States v. McMorris*, 224 Fed.Appx. 549, 551 (8th Cir. 2007) (holding the court did not err in finding malice aforethought where defendant intentionally discharged a gun a law enforcement from 50 to 60 feet).

Further, regarding premeditation, a killing (or attempted killing) is premediated "when it is intentional and the result of planning or deliberation." Eighth Circuit Model Instruction 6.18.1111A-2. "The amount of time needed for premeditation depends on the person and the circumstances," and is not a set length of time. *Id.* Instead, "[i]t must be long enough for the defendant, after forming the intent to kill, to be fully conscious of his intent and to have thought about the killing." *Id.* It is a fact-intensive inquiry and can be proven with circumstantial evidence. *United States v. Dale*, 614 F.3d 942, 963 (8th Cir. 2010). "[S]wift but deliberate actions before shooting [can] demonstrate that [a defendant] acted with the requisite premeditation." *Greer*, 57 F.4th at 629 (internal citations omitted). Proof that the defendant carried the murder weapon to the scene is "strong evidence of premeditation," *United States v. Begay*, 673 F.3d 1038, 1044 (9th Cir. 2011) (collecting cases), and defendant need not carry the weapon over a long distance. *United States v. Talbert*, 710 F.2d 528, 531 (9th Cir. 1983) ("If the jury determined that the killer picked up the murder weapon and carried it back seventy-five feet to [the victim's]

room, its finding of premeditation was justified."); *see also Belton v. United States*, 382 F.2d 150, 152 (D.C. Cir. 1967) ("that appellant entered the apartment with a loaded gun . . . permitted an inference that appellant arrived on the scene already possessed of a calmly planned and calculated intent to kill").

Here, Joshua Green's actions demonstrate both malice aforethought and premeditation. Regarding malice aforethought, Green's actions of repeatedly pulling the trigger on a loaded gun while pointing it at several police officers, while at close range, is reckless, wanton, and a gross deviation from a reasonable standard of care. Green fired seven shots at the officers while in very close proximity to those officers— sometimes within inches, and never more than several feet. (PSR ¶15; GX1, GX2, GX3, GX6, GX7.) Even after striking one officer in the head, knocking that officer unconscious, Green did not stop firing. (*Id.*) Instead, Green kept firing his gun at the remaining officers, striking a second officer at least once in the arm. (*Id.*) Green only stopped firing because the gun ran out of ammunition. Green's behavior of firing repeatedly at the officers, while at extremely close range, created "a much higher probability—a practical certainty—that injury to [those officers] [would] result." *United States v. Baez-Martinez*, 950 F.3d 950 F.3d 119, 127 (8th Cir. 2020). As outlined above, the Eighth Circuit has repeatedly found that Green's behavior— shooting at another person multiple times at close range—demonstrates malice aforethought. This Court should find the same.

Green's conduct also involved premeditation. Although the premeditation here wasn't over days, weeks, or months, it occurred over enough time for Green to be fully

conscious of his intent and deliberate about his conduct. Green led officers on a short vehicle pursuit, all while a loaded gun was present in the car. Green only stopped when he crashed his vehicle and it became disabled. But even then, Green didn't surrender to the officers, who were repeatedly giving him commands to do so. Instead, Green attempted to dislodge his disabled car to, assumingly, keep fleeing; repeatedly refused to comply with officers' commands to exit the vehicle (even after being struck by the officer's taser); struggled with the officers when they tried physically removing him from the vehicle; and pulled a gun on the officers and began firing. Green did not stop firing even after he struck an officer in the head, knocking him unconscious and, instead, fired at least five more shots. Green's actions evidence premeditation. Each step he took in this chain of unfortunate events was a step that required thought, planning, and an opportunity to make a better choice. Instead, Green, over and over, chose the path that led to his attempted first degree murder of several police officers that morning. Green planned to shoot the officers from at least the time he fled the traffic stop, and his actions demonstrate a methodical carrying out of his plan.

Of course, while there is no question of Green's actions and intentions in the early morning hours of September 16, 2024, his actions must be reasonably foreseeable to Defendant and in furtherance of their jointly undertaken criminal activity in order for Defendant to be held accountable under the guidelines. *United States v. Vega*, 720 F.3d 1002, 1004-05 (8th Cir. 2013). For the reasons that follow,

they were, and Defendant should be attributed the base offense level for first degree attempted murder.

USSG §1B1.3(a)(1)(B) states that the offense conduct used to determine the base offense level should, in the case of a jointly undertaken criminal activity, be calculated based on the acts and omissions of others that were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." USSG §1B1.3(a)(1)(B). In determining what a defendant agreed to jointly undertake, the court "may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." USSG §1B1.3, comment. (n.3(B)). The court must then determine whether the conduct of others that was within this jointly undertaken criminal activity was "reasonably foreseeable in connection with that criminal activity." USSG §1B1.3, comment. (n.3(D)). The Commission explains, as an example, that when two defendants agree to commit a robbery and, during the course of that robbery, one of the defendants assaults and injures a victim, the second defendant is accountable for that assault and injury "(even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone)" because the assault was within the jointly undertaken criminal activity, in furtherance of it, and reasonably foreseeable given the nature of the offense. *Id.*

8

Here, Green's shooting of Defendant's gun at the police was within the scope of Green and Defendant's jointly undertaken criminal activity, was in furtherance of that criminal activity, and was reasonably foreseeable to Defendant. First, although the jointly undertaken criminal activity of Green and Defendant arguably may have originally been limited to Defendant's long-term providing of Green with a firearm, on September 16, 2024, that jointly undertaken criminal activity significantly expanded due to Defendant's actions. Specifically, when Defendant directed Green to flee from the police during a traffic stop, knowing there was a loaded gun in close proximity (PSR ¶¶23, 25; Dkt. No. 32 at ¶7(c), 7(d)), their jointly undertaken criminal activity expanded from illegal firearm possession to significantly broader conduct. And Green's actions, which were all pursuant to Defendant's direction for him to flee the police to avoid going back to prison, were within that jointly undertaken criminal activity.

Similarly, Green's shooting Defendant's gun at the police during that traffic stop was in furtherance of that criminal activity. In shooting Defendant's gun at the police, Green was carrying out Defendant's instructions, which were to get away from the police so that Green didn't have to go back to prison. (PSR ¶25.) Green executed Defendant's instructions in multiple ways—by first driving away from the traffic stop and, then, when the vehicle became disabled, trying to dislodge it to continue the flight. When that didn't work, he tried several other, escalating, steps until finally he realized the only way he might be able to effectuate Defendant's instructions was to shoot his way out of the mess they created. Never during the traffic stop or flight

or lengthy struggle to get Green out of the vehicle did Defendant alert officers to the presence of a gun. Instead, Defendant made furtive movements through the traffic stop, opened her door and stuck her leg out, and otherwise remained silent. This behavior supports the conclusion that Green shooting at the police was in furtherance of Defendant and Green's joint plan to escape arrest to avoid Green going back to prison.

Finally, Green's shooting at the police with Defendant's gun was reasonably foreseeable to Defendant. While Defendant now claims she had no idea Green had her gun the morning of September 16, 2024, her own admissions and actions say otherwise. Defendant provided Green with her gun over an extended period of time, including taking affirmative steps to ensure both her and his possession of it. (PSR ¶¶22, 31.) She provided it to Green even after she knew he had been convicted of a felony and was on parole. (PSR ¶¶30, 31, 32.) Defendant told police she specifically provided it to Green for "protection," the whole purpose of which is to fire it if needed. (PSR ¶33.) Further, Defendant's statements indicate she knew Green carried the gun outside of the residence and that the ammo box the gun was often kept in was located at Defendant's feet in the vehicle that morning. (PSR ¶¶23, 26, 27, 30, 32, 33.) Her admissions in her plea agreement include that she knew Green had the gun on September 16, 2024 (Dkt. No. 32 at ¶7(c), 7(d)), and her statement during the post-Miranda interview noted that she knew the gun was in the car at the time of the stop (PSR ¶23). And, unfortunately, shootings during traffic stops/flight from police are not an uncommon occurrence, making Green's shooting reasonably foreseeable based

on the nature of the offense alone. *See, e.g.*, https://www.wowt.com/2024/07/31/bellevue-man-killed-by-des-moines-police-during-pursuit/; https://dps.iowa.gov/press-release/2025-01-27/dci-investigates-storm-lake-officer-involved-shooting; https://ankenyiowa.gov/CivicAlerts.aspx?AID=77; https://wsvn.com/news/local/miami-dade/subject-dead-after-pursuit-ends-in-police-involved-shooting-in-nw-miami-dade/; https://www.nbcwashington.com/news/local/northern-virginia/police-identify-suspect-killed-in-traffic-stop-shooting/3899211/; https://news.wttw.com/2024/11/06/man-charged-murder-fatal-shooting-chicago-police-officer-enrique-martinez.

At best, Defendant's actions and words demonstrate willful bindless to the fact Green had the gun during the traffic stop. But all of her statements and actions show Defendant's knowledge was far more. Defendant cannot provide someone she knows is a baker with yeast, flour, water, an oven, state she's hungry for carbs, and then claim to be surprised when the person bakes a loaf of bread. Similarly, she cannot now feign ignorance when Green shoots at police officers after she provided Green, a known violent felon and methamphetamine user, with a gun and then told him to flee the police to avoid prison. This is especially true given Defendant's knowledge of the effect her words would have on Green. (PSR ¶25.)

Green's actions were within the scope of his jointly undertaken criminal activity with Defendant, in furtherance of their criminal activity, and reasonably

foreseeable to Defendant in connection with that criminal activity. The Court should apply the first degree attempted murder guideline, for a base offense level of 33.

### THE § 3553(a) FACTORS SUPPORT A 292-MONTH SENTENCE[3]

The appropriate sentence to be imposed by the Court should be "sufficient but not greater than necessary" to meet relevant sentencing objectives, which include:

1.   the nature and circumstances of the offense and history and characteristics of the defendant;
2.   the need for the sentence imposed –
     A.  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
     B.  to afford adequate deterrence to criminal conduct;
     C.  to protect the public from further crimes of the defendant; and
     D.  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
3.   the kinds of sentences available;
4.   the guideline sentencing range;
5.   any pertinent policy statement;
6.   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
7.   the need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a). For the reasons that follow, the § 3553(a) factors support a 292-month sentence.

Defendant's conduct is a textbook example of exactly why the firearm laws in this country are important and should be taken seriously. Defendant, over an extended period of time, repeatedly disregarded those laws in multiple different ways. First, she herself was prohibited from possessing firearms as a methamphetamine

---

[3] Should the Court disagree with the guideline calculation included in the PSR and supported by the government, the government reserves the right to move for an upward departure (in addition to an upward variance), pursuant to USSG §5K2.2 (Physical Injury) and/or USSG §5K2.6 (Weapons and Dangerous Instrumentalities).

user.  And, instead, personally possessed a gun over multiple years.  Drug use and gun possession is a dangerous combination.  Using drugs affects your mental acuity and logical reasoning on multiple levels.  An individual in this altered mental state has no business possessing a deadly weapon such as a firearm.  Defendant's commission of the crime of drug user in possession of a firearm is, in and of itself, a serious one.

Second, Defendant also allowed a methamphetamine user, conviction felon, and violent individual—Joshua Green—to possess her firearm over multiple years.  Even after Green went to state prison for possessing Defendant's gun as a felon, giving Defendant a golden opportunity to withdraw from this course of conduct, she did not stop.  Instead, she went to the Des Moines Police Department and demanded they return the gun to her, which they did.  And then, when Green was released from state prison, she allowed him to again possess her gun.

Making matters exponentially worse, Defendant not only knew of Green's possession of her gun, but recognized it was problematic, recognized the solution to the problem (getting rid of the gun), yet continued to allow Green to have it.  Unfortunately, one of the times Green chose to take Defendant's gun was September 16, 2024.  And on that night, with Defendant's encouragement, Green chose to flee from the police, pull a gun on them, and repeatedly fire that gun at the officers at extremely close range.  Green struck two officers with the bullets he fired.  One of the officers was hit directly in the head.  Luckily, the officer survived, but Green and

Defendant's actions caused lifelong consequences for this officer. The second officer was hit in the arm. Again, the officer survived, but will also have permanent damage.

While the physical harm is, perhaps, somewhat quantifiable, the mental damage Defendant and Green caused that night is not. The PSR and the Government's Exhibits show the pure horror Defendant and Green inflicted that night on all of the officers at the scene. Imagine having to drag the body of your fellow officer down a street, not knowing if he is dead or alive, you yourself having been shot in the arm, while bullets are still being fired at you. Imagine having to place a tourniquet on your own arm, only to then use your own bare hands to try to stop the bleeding coming from your fellow officer's bullet hole to the head. It's hard to imagine any of that, because it's unimaginable. But, Defendant's actions brought the unimaginable to life for several officers on September 16, 2024.

While, true, Defendant herself didn't pull the trigger that night, she did everything but. And, but for her actions, there would have been no trigger to pull and no flight that created the situation causing the trigger pulls. She provided the match. She provided the flint. And she instructed "strike." Defendant is just as responsible as Green for the fire that ensued that morning.

The facts of this case independently justify the 292-month sentence, regardless of the guidelines. While this single incident itself was incredibly aggravating, Defendant's repeated conduct over a multiple year time frame add to this aggravating nature. Green was a ticking time bomb who just happened to explode on September 16, but it could have happened any of the other days Defendant allowed Green to

have her gun.  Adding to the justification for a lengthy sentence is the general deterrent factor.  Significant sentences in cases such as this one send a message to the community that providing guns to the trigger pullers will be taken just as seriously as pulling the trigger.  Defendant's case provided a textbook example of one of the worst possible outcomes of this type of behavior.  The Court should punish it as such to discourage others from traveling down her same path.

## CONCLUSION

The Court should sentence Defendant to 292 months' imprisonment.

Respectfully Submitted,

Richard D. Westphal
United States Attorney

By:    */s/ Kristin M. Herrera*
Kristin M. Herrera
Assistant United States Attorney
210 Walnut Street, Suite 455
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: kristin.herrera@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2025, I electronically filed the foregoing with the Clerk of Court using the CM ECF system.  I hereby certify that a copy of this document was served on the parties or attorneys of record and the United States Probation Officer by:

____ U.S. Mail ____ Fax ____ Hand Delivery

_X_ ECF/Electronic filing ___ Other means (email)

UNITED STATES ATTORNEY
By:    */s/Kristin M. Herrera, AUSA*