IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHAWNNA MARIE CUNNINGHAM,<br><br>Defendant. | Criminal No. 4:24-cr-140<br><br>DEFENDANT'S SENTENCING MEMORANDUM |

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................1

II    ADVISORY SENTENCING GUIDELINE CALCULATION...........................................3

III.   18 U.S.C. § 3553(a) ANALYSIS......................................................................................12

### I.    INTRODUCTION

On October 16, 2024, the government obtained a three-count indictment charging the defendant, Shawnna Cunningham, with being an unlawful user of controlled substances in possession of a firearm from on or about March 2022, to September 16, 2024, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(8) (count one); aiding and abetting a felon in possession of a firearm from on or about January 8, 2024, through September 16, 2024, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (count two); and with disposal of a firearm to a felon from on or about January 8, 2024, through September 16, 2024, in violation of 18 U.S.C. §§ 922(d)(1) and 924(a)(8) (count three). A notice of forfeiture was also filed, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c). On February 10, 2025, Ms. Cunningham formally accepted responsibility by pleading guilty to counts one and two, that is, being an unlawful user of a controlled substance in possession of a firearm and aiding abetting a felon in possession of a firearm,

pursuant to a written plea agreement that calls for dismissal of count three at the time of sentencing.   The plea agreement also consents to the forfeiture in the case.  The Court accepted her guilty pleas and adjudicated her guilty on March 3, 2025.

Over Ms. Cunningham's objection, the presentence report drafter determined that the base offense level under the advisory sentencing guidelines is 33, after applying a cross reference to attempted first degree murder. (PSR ¶43).  Because a victim sustained a life-threatening bodily injury, an additional four level increase was applied. (PSR ¶44).  And because law enforcement officers were assaulted during the course of the offense in a manner creating a substantial risk of serious bodily injury, six additional levels were added. (PSR ¶45).  After applying a three-level reduction for acceptance of responsibility (PSR ¶¶50–51) and calculating her criminal history category as I (PSR ¶58), the presentence report drafter found a total offense level of 40, and an advisory sentencing guideline range of 292 to 365 months of imprisonment. (PSR ¶120).

Ms. Cunningham maintains her objection to the guideline calculation in the report.  She asserts that although she aided and abetted the possession of a firearm by a felon, she did not aid and abet the felon's subsequent assault with intent to commit murder on police officers on September 16, 2024, and is not responsible for that act under the advisory sentencing guidelines. Ms. Cunningham believes a proper application of the advisory guidelines in this case would be: under USSG §2K2.1, base offense level 14 for her being an unlawful drug user, plus 4 levels for possessing the firearm in connection with another felony offense (here, aiding and abetting Joshua Green's possession of the firearm as a felon), plus 2 levels under USSG §3C1.2 because Ms. Cunningham recklessly induced Mr. Green to flee in a vehicle and the acts of flight created a substantial risk of death or serious bodily injury to others, resulting in a total offense level of 20. After applying the reduction for acceptance of responsibility, the total offense level becomes 17.

At criminal history category I, the resulting advisory sentencing guideline range would be 24 to 30 months of imprisonment.[1]  Regardless of the ultimate advisory guideline determination, the ultimate question is what sentence is "sufficient, but not greater than necessary" for Ms. Cunningham in this case pursuant to the factors of 18 U.S.C. § 3553(a).

## II.  ADVISORY SENTENCING GUIDELINE CALCULATION

The facts of the offense appear to be undisputed, although the exhibits submitted by the parties will supplement the summation in the final presentence report with more detail.  On September 16, 2024, at approximately 1:40 a.m., Des Moines police officers initiated a traffic stop on a vehicle that had a non-operating brake light that was being driven by Joshua Green. (PSR ¶12); *see also* Def.'s Ex. A.  Shawnna Cunningham, Mr. Green's paramour, was in the front passenger seat of the car. *Id*.  After pulling into a gas station, Mr. Green then sped off and led officers on a brief chase into a residential area, until the car became stuck in front of a parked truck. *Id*.  Officers ordered Mr. Green to exit the car, but he instead repeatedly revved the engine and placed the car in reverse while trying to dislodge it to presumably continue to try to flee. (PSR ¶13); Def.'s Ex. A.

The officers yelled at Green that he was going to be tased if he did not comply with their commands, but he still did not exit the vehicle. (PSR ¶14); Def.'s Ex. A.  Officer C.M. then shot

---

[1]  The fact that Joshua Green shot at and injured the police officers in the case is better considered through the departure provisions of the guidelines for physical injury under USSG §5K2.2, which contemplates upward departures where "significant physical injury resulted" as part of an offense.  The policy statement further recognizes that the degree of departure can then be assessed based on degree of criminal culpability: "the extent of the increase should depend on the extent of the injury, the degree to which the injury was intended or knowingly risked" . . . and a substantial departure may be warranted when major injury "was intentionally inflicted" but "a less substantial departure would be indicated" where a defendant is "criminally negligent" or otherwise did not specifically intend for a physical injury to occur. *See id*.

Mr. Green with a taser, but Green remained in the vehicle as officers came toward him. *Id*.
Officer C.M. tased Mr. Green again, and after he still did not exit the vehicle Officer J.B. pulled
on his foot to drag him out, causing Green to fall to the ground outside the driver's door. *Id*.

Once Mr. Green was on the ground, Officer C.M. tried to grab his wrist. (PSR ¶15).  But
Mr. Green then reached into his waist area with his other hand, pulled a firearm, and began firing
at the two officers. *Id*.  He shot seven times at the officers, with the second shot striking Officer
C.M. in the head and knocking him unconscious, and one of the final shots hitting Officer J.B. in
the arm. *Id*.  The officers returned fire on Mr. Green, and he subsequently died from his injuries.
(PSR ¶16).  Officer C.M. required surgery, a lengthy hospital stay, rehabilitation, and extensive
follow up treatment with the possibility of having lifetime lasting effects from his injury and the
experience. *Id*.  Officer J.B. also required multiple surgeries, physical therapy, and may also have
lifetime lasting effects from his wound and the experience. *Id*.

After the shooting ceased, Ms. Cunningham was removed from the vehicle. (PSR ¶17).
She was transported to the police station for further investigation, and a methamphetamine pipe
was found in her bra in the search that occurred before transport. *Id*.  Inside the car at the scene, a
metal ammunition storage box was found on the front passenger floorboard, and two knives and
a digital scale were found on the driver's side floorboard. (PSR ¶18).  The firearm used by Mr.
Green was identified as a Smith & Wesson 9mm pistol that had been purchased by Ms.
Cunningham on May 1, 2020. (PSR ¶19).

Subsequent investigation determined that the firearm had previously been seized from
Mr. Green by Des Moines police officers on September 19, 2021, in response to report of an
individual who was high on methamphetamine acting erratically and damaging property. (PSR
¶20).  Mr. Green had the gun and a methamphetamine pipe on him when encountered by the

police, and was subsequently arrested and later convicted for being a felon in possession of a firearm. (PSR ¶¶21–22). The firearm was returned to Ms. Cunningham in March of 2022, at the conclusion of his case. (PSR ¶22). Mr. Green was paroled from prison for that crime in January of 2024, after which he moved in with Ms. Cunningham. *Id.*

Following the shooting, Ms. Cunningham provided a post-*Miranda* interview, during which she admitted she had purchased the firearm used by Mr. Green to shoot at the officers. (PSR ¶23). She said she had it inside the car at the time of the traffic stop, but could not recall exactly where, and thought it was probably in a box. *Id.* She admitted she was not supposed to have a gun because Mr. Green was on parole and living at her apartment, but she denied providing it to him prior to the shooting. *Id.* She also admitted she had used methamphetamine earlier in the day, and that she had an "issue" with the drug. (PSR ¶24). She stated that Mr. Green was her fiancé, and she had known him since June of 2021. (PSR ¶25). She said they had been making deliveries for Grub Hub earlier that night, with the last delivery being around midnight. *Id.* She said that Mr. Green asked her what to do when the police tried to pull them over, and that she told him to run because he did not have a license, had recently gotten out of prison, and she did not want him to go back. *Id.* Extremely distraught, she said it was "all her fault" because she told him to run, and said that he would have stopped if she told him to do so. *Id.* Ms. Cunningham denied knowing if Mr. Green took any drugs that night but acknowledged that he used methamphetamine and "has a lot of ups and downs." (PSR ¶26). When asked again about whether Green had that gun on him prior to the traffic stop, she did not know, but stated that she knew he had carried firearms in the past. *Id.*

Ms. Cunningham stated that she purchased her firearm from Scheels during "all of the rioting during COVID," but denied seeing Mr. Green with her gun that night. (PSR ¶¶26–27).

She said that if the gun was in the car, it would have been in the metal ammo box. (PSR ¶27). She had no idea how and when it got into Mr. Green's possession that night, and said she was not paying attention to it that night. *Id*. She noted that the box was normally behind the seats in the backseat area but added that the box was open earlier that night when they put "McDonalds" food in it and put it between the two seats to eat. *Id*.

Three days later, a search warrant was executed at Ms. Cunningham and Mr. Green's shared residence. (PSR ¶28). The search found paraphernalia for methamphetamine use, a user quantity of methamphetamine in Ms. Cunningham's purse, documents referring to Mr. Green's prison term, correspondence between Cunningham and Green while he was incarcerated, legal paperwork regarding Green's felony conviction, and some random ammunition. *Id*. Ms. Cunningham provided a second post-*Miranda* interview, where she reiterated that she did not know Mr. Green had her gun the night of the shooting. (PSR ¶29). She stated that she did not know the gun was in the vehicle, and that she thought it was at their apartment in their shared bedroom. *Id*. She noted that she kept the gun in the bedroom on a shelf in an unlocked ammunition box. *Id*.; *see also* Def.'s Ex. B. She admitted that Mr. Green would sometimes carry her gun, that she knew he had previously been arrested for doing so, and that she knew he had a felony conviction. (PSR ¶30). She acknowledged getting her gun back in 2022 after Mr. Green went to prison for it, and that things were difficult for her while he was in prison. (PSR ¶31). She said she had to live out of her car for a while, during which her gun and other possessions were in her car too. *Id*. She was using methamphetamine during that time, and later obtained her residence in June of 2022. *Id*.

Ms. Cunningham confirmed that Mr. Green paroled directly to her apartment in January of 2024, and that they were both using methamphetamine "on and off." (PSR ¶32). She admitted

6

that she knew Mr. Green was carrying her gun at times because she had caught him putting it away more than once, and they had argued about it. *Id*. She said they argued about him carrying her gun because she knew he was prohibited from possessing firearms, but she noted that he would then "sweet talk" her until she stopped being angry at him. *Id*. She said Mr. Green had been attacked in the past, and that he would carry her gun for protection. (PSR ¶33). She indicated she had thought about selling the gun because he was not supposed to have one but had never followed through with doing so. *Id*. She added that she had also seen Mr. Green with a different gun in the preceding months. *Id*. An additional search warrant for Ms. Cunningham's urine was also executed, which confirmed the presence of amphetamine, methamphetamine, morphine, and topiramate in her system. (PSR ¶34).

The government and final presentence report assert that the facts of the case support finding that Ms. Cunningham aided and abetted Mr. Green's attempt to commit murder when he shot at the officers, and that a corresponding cross reference in the advisory sentencing guidelines is applicable. But, although Ms. Cunningham aided and abetted Mr. Green's possession of a firearm as a felon, she did so by knowing he had possessed her firearm at times since his release from prison for a felony offense. She did not aid and abet his assault with intent to commit murder on the police officers on September 16, 2024—she had no idea that he would decide to shoot at the officers as they attempted to restrain him after tasing him and pulling him from the vehicle—indeed, there is insufficient evidence that she knew he was even in direct possession of the firearm at that specific moment in time. She did not take an affirmative action to intentionally facilitate his discharge of the firearm, and there is no evidence that she had advance knowledge of his intent to fire the weapon at the officers. *See Rosemond v. United States*, 572 U.S. 65, 71 (2014) (noting that, at common law, a person is liable for aiding and

7

abetting a crime "if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission" (citing W. LaFave, Substantive Criminal Law § 13.2, p. 337 (2003))).  Nor did she counsel him to fire the weapon, induce him to fire the weapon, or willfully cause him to do so. *See* USSG §1B1.3(a)(1)(A) (defining relevant conduct for the sentencing guidelines to include "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant); *see also* 18 U.S.C. § 2.

Ms. Cunningham needed to have provided aid to Mr. Green "*with the intent to facilitate the crime*" of attempted murder in order be criminally responsible for his action. *See Rosemond*, 572 U.S. at 71 (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994) (emphasis added).  Although she urged him to flee the traffic stop, it does not follow that she was also simultaneously inducing or encouraging him to try and kill the officers when she did so.[2] *See United States v. Nichols*, 76 F.4th 1046, 1055 (8th Cir. 2023) (noting that an aider and abettor defendant "must affirmatively act in a manner which at least encourages the perpetrator" to commit a specific crime (citing *United States v. Jourdain*, 433 F.3d 652, 656 (8th Cir. 2006) (internal quotation omitted))).  Absent evidence that she aided and abetted his general offense of being a felon in possession of a firearm *and* did so with the specific/shared intent to facilitate his attempted murder of police officers, the advisory guidelines

---

[2]  Murder is the unlawful killing of a human being with malice aforethought, and first-degree murder requires the unlawful killing be attempted as part of specific listed crimes, or with premeditation. 18 U.S.C. § 1111; *see also* USSG §2A2.1, n.1 (utilizing this same federal definition for application purposes).  There is simply no evidence that Ms. Cunningham shared Mr. Green's intent to assault or kill the police officers in this case at all, much less that she shared any premeditation or malice aforethought. *See Nichols*, 76 F.4th at 1055 ("An aider and abettor of first degree murder must share the 'same intent' as the principal." (citing *United States v. Wilson*, 665 F.2d 825, 830 n.6 (8th Cir. 1981))).

do not allow application of the cross reference. *See Hicks v. United States*, 150 U.S. 442, 449
(1893) (stating that an accomplice is liable when his acts are done "with the intention of
encouraging and abetting" the crime of the principal).  The language of the guideline's cross
reference itself further contemplates that liability in cases involving allegations of firearms being
transferred would still require "knowledge or intent that it would be used or possessed in
connection with another offense" to apply the cross reference to that specific offense, thereby
making clear that a defendant must know or intend that another person would commit a *specific*
crime in order to be punished for it. USSG §2K2.1 (c)(1); *see also Rosemond*, 572 U.S. at 77
(stating that the Court has "previously found that intent [to facilitate a crime's commission]
requirement satisfied when a person actively participates in a criminal venture with full
knowledge of the circumstances constituting the charged offense" and citing examples where
aiding and abetting convictions were upheld because the aider and abettor knew the specific
actions his confederates were undertaking).[3]  Ms. Cunningham told Mr. Green to flee the traffic
stop, but she did not tell him to fight the police or try to shoot them, and therefore did not aid or
abet those actions by Mr. Green. *Compare United States v. Darden*, 70 F.3d 1507, 1545 and n.14
(8th Cir. 1995) (finding the defendant accountable for being present at a meeting where the

---

[3]  The Eighth Circuit Model Criminal Jury Instruction for Aiding and Abetting is also instructive.
It requires: (1) the aider and abettor to have known the *principal* offense was being committed *or
going to be committed*; (2) have had enough advance knowledge of the extent and character of
the crime that she was able to make the relevant choice to walk away from the crime before all
elements of the crime were complete; (3) have knowingly acted in some way for the purpose of
causing, encouraging, or aiding the commission of the *principal* offense; (4) and have intended
or known the mens rea of the *principal* offense.  Eighth Circuit Model Criminal Jury Instruction
5.01 Aiding and Abetting (2023) (emphasis added).  The instruction further contains optional
language making clear that merely being present or associating with others does not prove
someone has become an aider and abettor, and that "[a] person who has no knowledge that a
crime is being committed or about to be committed, but who happens to act in a way which
advances some offense, does not thereby become an aider and abettor." *See id.*

murder weapon was loaded and there was a discussion about killing the victim, and then

delivering it to another residence so another person could retrieve it and use it in a retaliatory

murder) with *Nichols*, 76 F.4th at 1056 (defendant who rode in the back seat of a vehicle to the

scene of a shooting did not aid and abet attempted murder because he did nothing to facilitate the

attempted murder offense beyond being present in the car).  The cross reference to assault with

intent to commit murder cannot be applied to Ms. Cunningham under an aiding and abetting

theory or any other liability theory in the advisory sentencing guidelines.[4]

Absent the cross reference to USSG §2A2.1, USSG §2K2.1 controls the case.  There, as

an unlawful user of controlled substances, Ms. Cunningham's base offense level is 14 under

USSG §2K2.1(a)(4).  An additional four levels for possessing the firearm in connection with

another felony offense—here the aiding and abetting of Mr. Green's felon in possession of a

firearm crime—supports an adjustment under USSG §2K2.1(b)(6)(B). *See also United States v.*

---

[4] In the addendum to the final presentence report, the Probation Office ignores the mens rea
included in the cross reference in USSG §2K2.1(c)(1) and attempts to avoid the aiding and
abetting liability issue by instead trying to link Mr. Green's attempted murder of the officers to
Ms. Cunningham's initial entreaty to him to flee, by arguing that all the acts were jointly
undertaken criminal activity under USSG §1B1.3(a)(1)(B).  But even if the eluding was "jointly
undertaken criminal activity," Mr. Green's attempt to kill the officers was not within the scope of
it.  The commentary describing the scope of "jointly undertaken criminal activity" specifically
states that: "the accountability of the defendant for the acts of others is limited by the scope of
his or her agreement to jointly undertake *the particular* criminal activity.  *Acts of others that
were not within the scope of the defendant's agreement, even if those acts were known or
reasonably foreseeable to the defendant, are not relevant conduct* under subsection (a)(1)(B)."
USSG §1B1.3 n.3(B) (emphasis added).  Again, the only "plan" or "agreement" between Ms.
Cunningham and Mr. Green in the moment was to run from the police.  His subsequent decision
to fight after being tased and pulled from the vehicle was outside the scope of any initial
"agreement" or "plan" with Ms. Cunningham to elude in the vehicle, and the analysis ends at that
point.  But, even if the argument can somehow live on, on these facts Mr. Green's shooting of
the firearm did nothing to further the attempt to flee, as there is no evidence to suggest that Ms.
Cunningham should have reasonably foreseen that he would try to kill the pursuing officers as
part of an attempt to elude in their vehicle.

*Jackson*, 633 F.3d 703, 705–706 (8th Cir. 2011) (discussing application note 14(c) and indicating that a firearm possession offense can facilitate another felony firearm possession offense, so long as it is not the defendant's offense of conviction itself).   Because Ms. Cunningham induced Mr. Green to try and flee in the vehicle, because he did then briefly flee at high speed in a residential neighborhood at night before crashing, and because he then attempted to back the car off whatever it was stuck on and thereby created a substantial risk that he might hit the officers' car or the officers themselves if he was successful, a two-level increase for reckless endangerment during flight may be applicable to Ms. Cunningham under USSG §3C1.2. *See, e.g.,* U*nited States v. Pierce,* 388 F.3d 1136, 1138 (8th Cir. 2004) (enhancement was warranted where defendant rammed police truck multiple times and collided with parked cars); *United States v. Carrero-Hernandez*, 643 F.3d 344, 349–350 (1st Cir. 2011) (affirming the enhancement on a brief chase at relatively low speeds because it occurred in early evening in a heavily populated area with poor visibility, because the risk of potentially disastrous harm was sufficient).[5]   After applying the three-level reduction for acceptance of responsibility, the total offense level would be 17, at criminal history category I, for an advisory sentencing range of 24 to 30 months of imprisonment prior to consideration of departures or variances.

---

[5]  While the USSG §3C1.2 guideline has a somewhat broad applicability to the potential risks of flight, the §3A1.2(c) enhancement is more limited in application and not applicable in this case. That enhancement requires that Ms. Cunningham be "otherwise accountable" for Mr. Green's assault on the officers after they pulled him from the car.  "Otherwise accountable" has been interpreted by the Eighth Circuit to mean "there must be some evidence of causation on the part of the defendant: that is, the defendant expressly or impliedly ordered encouraged, or in some way assisted the assailant's conduct." *United States v. Iron Cloud*, 75 F.3d 386, 390 (8th Cir. 1996).  While Ms. Cunningham induced Mr. Green to flee, she did not induce him to fight—either expressly or impliedly—and did not cause him to do so, and even applying the general relevant conduct principles of the guidelines there is no evidence that she "aided, abetted, counseled, commanded, induced, procured, or willfully caused" Mr. Green to shoot at the officers, as discussed above. *See* USSG §1B1.3(a)(1)(A).

11

### III.     18 U.S.C. § 3553(a) ANALYSIS

After determining the correct sentencing guideline calculation and resulting advisory sentencing range, the question turns to what sentence is "sufficient, but not greater than necessary" for Ms. Cunningham in this case.  Obviously, as illustrated by what happened in this case, firearms are extremely dangerous, and apart from being prohibited from possessing a firearm due to her drug use, Ms. Cunningham also epically failed in her responsibility as a firearm owner.  She had caught Mr. Green possessing her firearm before but failed to take action to prevent him from doing so again.  She turned a blind eye to his behaviors, fell for his "sweet talk" when she did confront him, and was oblivious to the location of her firearm in the early morning hours of September 16, 2024.  This resulted in Mr. Green having access to her gun such that he was ultimately able to fire it at police officers after they tased him and pulled him from his vehicle.  Even though the motive for his actions in that moment are unknown, Ms. Cunningham did know he could be "up and down" in his moods, that he used methamphetamine, that he was a felon prohibited from possessing firearms, and that he had taken her gun from their apartment in the past.  The result of Mr. Green's possession of Ms. Cunningham's firearm is what the law sought to prevent by taking his firearm rights away from him after his prior criminal convictions.  Even if Ms. Cunningham is not legally responsible for aiding and abetting Mr. Green's shooting of the police officers in this case, she bears legal responsibility and moral accountability for his ability to gain possession of her firearm at all.  She recognizes that the Court must weigh this reality in the sentencing calculus.

But it is also clear that Ms. Cunningham's history and characteristics played a role in how she wound up in the relationship with Mr. Green that has brought her before the Court.  She is forty-seven years old and grew up in a troubled home where her mother struggled with alcohol

use and depression. (PSR ¶¶63, 70).  She was sexually abused by her maternal grandmother's boyfriend when she was around three years old, and recalls seeing her mother assault the perpetrator only to later then be brought back to that home by her mother anyway. (PSR ¶65).  At age thirteen, her mother had her writing letters to prison inmates, only for Ms. Cunningham to later learn that her mother told an inmate pen pal about the abuse. (PSR ¶66).  Her mother was also frequently physically abusive toward Ms. Cunningham and her father as she grew up, and left Ms. Cunningham responsible for caring for herself, her siblings, and the household while her father worked. (PSR ¶¶64–65, 68).  Her father stayed in the marriage for years for the sake of the children, but Ms. Cunningham eventually discovered that her mother was having an affair and showed her father the evidence, and her parents then divorced when Ms. Cunningham was sixteen. (PSR ¶63).  Ms. Cunningham was "never able to be a kid" and endured more than any child should have to experience. (PSR ¶68).

After the divorce, Ms. Cunningham briefly went to live with her father while her younger siblings went with her mother. (PSR ¶63).  Soon thereafter, she entered an "on and off" relationship and became a teen mother and moved out of her father's home. (PSR ¶¶68, 77). That partner was unfaithful, would take her car and disappear for months at a time, and had problems with the law and with methamphetamine use. (PSR ¶77).  During one of his absences from her life, she entered a two-year relationship and had her second child when she was nineteen. (PSR ¶78).  That partner was emotionally, physically, and mentally abusive to Ms. Cunningham, and also used acid, marijuana, and methamphetamine. *Id*.  After having her first child, Ms. Cunningham had to leave high school, but still managed to complete her general equivalency degree through Des Moines Area Community College. (PSR ¶¶101–102).  These relationships exposed her to marijuana and methamphetamine usage, but she only used

13

marijuana socially until age nineteen, and at age twenty used methamphetamine less than ten times before quitting. (PSR ¶¶95–96).

Ms. Cunningham spent the next few years working to support herself and her young children and would sporadically take summer college classes in pursuit of an associate degree in science and human services. (PSR ¶103).  But in 2007 she married another man who was verbally, emotionally, and physically abusive, and they had a son. (PSR ¶76).  Her husband suffered from bipolar disorder, had problems with the law, and had a drinking problem, but Ms. Cunningham stayed in the marriage for six years because at the time she thought it would be good for her son to have a two-parent home. *Id*.  During the marriage Ms. Cunningham was having neurological problems that caused vision loss, aphasia, confusion, and headaches, and she was eventually diagnosed with having complex migraines. (PSR ¶¶87–89).  She also had problems with her sleep, diet, weight gain, appetite, and anxiety, which resulted in a diagnosis of major depressive disorder and her going to therapy, during which she had an incident where she cut herself because she just "wanted to feel something." (PSR ¶¶91–93).  Her depression deepened in 2013 after her father died from complications of heart bypass and gallbladder removal surgery, and she subsequently gained a "substantial amount of weight." (PSR ¶71).  Despite these struggles, she still maintained full time employment at an O'Reilly Auto Parts distribution center, and as a store manager at EZ Money Check Cashing. (PSR ¶¶108–109).

A few years later, Ms. Cunningham underwent gastric weight loss sleeve surgery as part of her efforts to work through her depression and to improve her health. (PSR ¶86).  The surgery was successful, but she still has ongoing problems with osteoarthritis and will need knee replacements in her future, also suffers from bunions, and the bones on the top of her feet are fusing together. (PSR ¶86).  Ms. Cunningham also found herself substituting alcohol

14

consumption for her prior eating habits after the surgery and spent around two years drinking every weekend. (PSR ¶97). But even though she was able to quit drinking, she replaced that habit with methamphetamine use, which continued up until September 15, 2024. (PSR ¶96). She found herself still able to work full time despite her drug and alcohol use, but her use negatively impacted her health and finances. (PSR ¶98). She was ashamed of herself and was afraid to seek help because she did not want her children or her employer to know the extent of her problem. *Id*.

In the midst of these struggles, Joshua Green entered her life, and they started a relationship in June of 2021. (PSR ¶75). Unlike her prior relationships, Mr. Green was kind to her and did abuse her like she had endured in the past. *Id*. But he also was a user of methamphetamine, which created an environment where he and Ms. Cunningham could use each other to avoid addressing their addictions and the impact it was having on their lives. *Id*. And even though he was good to Ms. Cunningham, he brought with him a history of problems with the law, and significant mental health diagnoses. *Id*. Ms. Cunningham's world shrunk until it revolved mainly around her relationship with Mr. Green and their relationship with methamphetamine use. When Mr. Green was released on bond in December of 2021 on the prior state charge for possessing her firearm in September of that year, Ms. Cunningham left her job with no plan in place the following day, which is indicative of an unhealthy relationship dynamic. (PSR ¶108); *see also State v. Green*, FECR352521 (D0027, release order of December 1, 2021). And when he was sentenced to imprisonment on January 18, 2022, she lost her residence and was living out of her car until May of 2022 when she obtained a new job and a new apartment. (PSR ¶¶80, 107); *see also Green*, FECR352521 (D0033, order of disposition).

One can see how Ms. Cunningham's feelings for Mr. Green and fear of losing him again led to her excusing his behaviors and not recognizing the risks he brought with him.

Indeed, it has taken the terrible events of this case for Ms. Cunningham to recognize where her life was, and to engage in the introspection necessary to change in the future. She has never been in jail before her detention in this case, and her only criminal history consists of a fifth-degree theft offense for shoplifting clothing for her child when she was twenty-two and providing tobacco to a minor during a bad day at work when she was twenty-five. (PSR ¶¶55–56). The totality of this experience, as noted by her daughter, has been a "big wake up call" for Ms. Cunningham, and she is dedicated to focusing on "rekindling relationships" with her children and grandchildren. (PSR ¶69). Her family sees the positive changes in Ms. Cunningham, and they and Ms. Cunningham recognize that continued mental health treatment and future substance use treatment will help her further pursue those positive changes and build on the progress she has made on her own thus far. (PSR ¶¶69, 94, 99).

The advisory range calculated in the final presentence report and sought by the government in this case tries too hard to force the facts into guidelines where they do not fit, in order to put the full weight of Mr. Green's actions on Ms. Cunningham. That guideline calculation does not work, for the reasons discussed above. This case is better suited to the exercise of reasoned judgment under the statutory sentencing factors contained in 18 U.S.C. § 3553(a), rather than shoehorned through the advisory guideline sentencing system. Ms. Cunningham is herself a tragic figure to some extent, having endured significant traumas throughout her life. Despite those traumas and her personal struggles, she has worked hard and been a provider for her children, even while hiding her shame and not knowing how to ask for the help she needed for herself. That tragedy is then drastically heightened by the facts of what

16

occurred in this case, where she was irresponsible and did not prevent Mr. Green from having access to her firearm despite what she knew about him and what he had done before. While it is unknown what was going through Mr. Green's mind when he shot at the officers on September 16, 2024, they were nearly killed, and their lives have been traumatically altered as well.

Ultimately, the nature and circumstances of the offense are aggravating, but Ms. Cunningham's individual history and characteristics are mitigating. 18 U.S.C. § 3553(a)(1); *see Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). There is a wide range of sentencing options available in this case that will reflect the seriousness of the offense and provide a just punishment that also promotes respect for the law. 18 U.S.C. § 3553(a)(2)(A), (3)–(5). Any sentence imposed on Ms. Cunningham will provide for specific deterrence to her, and the same wide range of statutory sentencing options available under the law permits the crafting of a just sentence that will similarly have "sufficient, but not greater than necessary" general deterrent force for the general public. 18 U.S.C. § 3553(a)(2)(B), (3)–(5). A lengthy sentence of imprisonment is unnecessary to protect the public from further crimes by Ms. Cunningham, given her history and characteristics, the fact that this is the first time she has ever been incarcerated, and her amenability to rehabilitative treatment. 18 U.S.C. § 3553(a)(2)(C). Her history further suggests that she will respond well to correctional treatment, and both that need, and her continuing medical needs will be better met in the community than through a lengthy sentence within the Bureau of Prisons. 18 U.S.C. § 3553(a)(2)(D); *see also* 18 U.S.C. § 3582(a) (stating that "imprisonment is not an appropriate means of promoting correction and rehabilitation"). No

unwarranted sentencing disparities will result from consideration of Ms. Cunningham's individual history and characteristics and how she compares to defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). Ms. Cunningham asks that the Court impose the sentence that is "sufficient, but not greater than necessary" to effectuate the goals of sentencing in this case. *See Kimbrough*, 552 U.S. at 101 (noting that 18 U.S.C. § 3553(a) "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing."); *accord Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766 (2020) (emphasizing that the law instructs sentencing courts to impose sentences that are not greater than necessary to comply with the goals of 18 U.S.C. § 3553(a)).

Respectfully Submitted,

*/s/ Joseph D. Herrold*
Joseph D. Herrold, Asst. Federal Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
400 Locust Street, Suite 340
Des Moines, Iowa 50309-2353
PHONE: (515) 309-9610
FAX: (515) 309-9625
E-MAIL: joe_herrold@fd.org
ATTORNEY FOR DEFENDANT

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2025, I electronically filed this document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.

*/s/ Morgan Conn*, Paralegal